**VIRGINIA VERMICULITE, LTD., plaintiff,**

v.

**W.R. GRACE & CO.–CONN. & THE HISTORIC GREEN SPRINGS, INC., Defendant.**

Nos. CIV. A. 3:95CV000185, 3:96CV00012, 3:96CV00013.

United States District Court, W.D. Virginia, Charlottesville Division.

May 4, 2000.

Roger Scott Martin, Martin & Woodard, PLC, Charlottesville, VA, Jane Champion Clarke, David Zev Izakowitz, Woods, Rogers & Hazelgrove, P.L.C., Charlottesville, VA, for plaintiff.

Thomas Eugene Albro, Patricia D. McGraw, Tremblay & Smith, Charlottesville, VA, David S. Copeland, Randolph S. Sherman, Eric L. Aaronson, Kaye, Scholer, Fierman, Hays & Handler, New York City, for W.R. Grace & Co.–Conn, defendant.

Michael Eugene Derdeyn, McGuire, Woods, Battle & Boothe, Charlottesville, VA, Charles H. Montange, Seattle, WA, Sara Lee Gropen, Rae H. Ely & Associates, Louisa, VA, Jane Champion Clarke, Woods, Rogers, & Hazelgrove, P.L.C., Charlottesville, VA, for Historic Green Springs, Inc.

MICHAEL, Senior District Judge.

On February 11, 2000, Defendant The Historic Green Springs, Inc. ("HGSI") filed a motion to exclude the expert report and testimony of Seth Schwartz, Virginia Vermiculite, Ltd.'s ("VVL") purported expert witness on market analyses for the present case. On February 29, 2000, Defendant W.R. Grace & Co.-Conn. ("Grace") joined in HGSI's motion. The court has received a substantial amount of evidence and heard arguments from counsel on the qualifications of Seth Schwartz. Having thoroughly considered the issue, the court will grant the defendants' motion to exclude Schwartz' report and testimony.

I.

In January 1998, VVL officially notified defendants that it was designating Seth Schwartz as an "independent economic consultant" under the governing protective order. Mr. Schwartz attained a bachelor's degree in geological engineering at Princeton University in 1977. Upon earning this degree, Schwartz began working for Robert Sansom (the President of VVL) at Sansom's then consulting firm, Energy and Environmental Analysis ("EEA"). When Sansom formed another consulting group, Energy Ventures Analysis ("EVA"), four years later, Schwartz followed Sansom to EVA. Schwartz is currently the co-owner of EVA with Sansom; and together, the pair own over 50% of the company's stock. Schwartz and Sansom are also co-investors in a natural gas storage facility in New York.

Through EEA and EVA, Schwartz has devoted most of his professional career to advising energy companies about various matters, some of which required Schwartz to perform market research analyses, including identifying and forecasting prices as well as business analyses for investment decisions. Schwartz also has testified in numerous non-antitrust cases relating to coal; however, Schwartz admitted, in his deposition and at the hearing, that none of these cases involved antitrust matters requiring the rigorous defining of a relevant market. In addition, Schwartz never has

authored a book or article dealing with antitrust issues or vermiculite.

Defendant Grace immediately objected to the designation of Schwartz, expressing grave concern about the "risk of inadvertent disclosure of highly confidential information." However, Grace asserts that "in the spirit of compromise," Grace agreed to withdraw its objection to Schwartz' designation on the condition that VVL limited its experts to Schwartz, rather than utilizing VVL's second named expert, Dr. Donald Martin of Glassman–Oliver Economic Consultants, Inc., who had earned a Ph.D in Economics from UCLA. Had Dr. Martin remained in the case, then there would have been no reason to permit Schwartz access to highly confidential business information. Thus, Grace in essence forced VVL to choose between Dr. Martin and Schwartz. Sansom decided to use Schwartz as the plaintiffs' antitrust economic expert.

To determine the relevant market for the present case, Schwartz utilized the Horizontal Merger Guidelines ("Merger Guidelines") issued by the United States Department of Justice and the Federal Trade Commission. The Merger Guidelines detail the current enforcement policy of the Department of Justice and the Federal Trade Commission concerning horizontal acquisitions and mergers subject to Section 1 of the Sherman Act. *See* Merger Guidelines, § 0. In his report, Schwartz defined the relevant market for a Section 1 claim to be mining rights in Louisa County. For the Section 2 claim, Schwartz broadened his definition to vermiculite concentrates in North America. In both definitions, Schwartz determined that foreign competitors in South Africa and China, whose imports have increased over the past decade, were not relevant to the market definition. Schwartz also determined that VVL would not feel the effects of the transfer of property from Grace to HGSI until several years in the future when VVL's reserves in Louisa County would be depleted. Moreover, Schwartz found that no substitutes existed for either mining rights or vermiculite concentrates. Schwartz' initial report was immediately criticized by the defense experts. In response, Schwartz filed a rebuttal and supplemental report.

Less than a week before the initial summary judgment hearing scheduled for February 17, 2000, Defendant HGSI, by motion, challenged the qualifications of Schwartz. HGSI alleged that Schwartz lacked expertise in both economics and vermiculite, and thus was inadequate to testify as an expert witness. VVL immediately moved to strike the motion to exclude Schwartz as untimely, particularly in light of the fact that the affidavit utilized to support HGSI's motion was taken over eight weeks earlier. Though HGSI's motion may be viewed as untimely,[1] because VVL must produce expert testimony in order properly to set forth a relevant market, it would have been a waste of judicial resources not to hold a Daubert hearing prior to summary judgment. *See Padillas v. Stork–Gamco,* 186 F.3d 412, 418 (3d Cir.1999) ("[W]hen the ruling on admissibility turns on factual issues, as it does here, at least in the summary judgment context, failure to hold [a Daubert] hearing may be an abuse of discretion"). At the February 17 hearing, Defendant Grace orally joined in HGSI's Motion to Exclude Schwartz; however, Grace withheld a memorandum to support its motion until the late afternoon of March 2, giving the court and the plaintiffs only one business day to consider Grace's arguments before the hearing was to begin on March 6. At the March 6 hearing, the court immediately realized that one day was inadequate for the parties to present their evidence. Consequently, the Daubert hearing re-

---

1. *See Webster v. Fulton County,* 85 F.Supp.2d 1375, 1377 (N.D.Ga.2000) ("... [A] pretrial request for a Daubert hearing must be made in a timely fashion or the objection is waived. A pretrial request for a Daubert hearing should be made within a reasonable time after the close of discovery if the grounds for the objection can be reasonably anticipated").

sumed on March 29 and continued to the evening of March 31. Thus, the court has heard a full four days of evidence regarding the expertise (or lack thereof) of Seth Schwartz.

## II.

A trial judge is required to determine at the outset whether a witness is qualified to testify. *See* Fed.R.Evid. 104(a). The starting point for evaluating whether an expert is qualified begins with Rule 702 of the Federal Rules of Evidence. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under Rule 702, a purported expert must first hurdle the obstacle of being qualified to testify as an expert. A witness can be qualified as an expert by "knowledge, skill, experience, training or education." Fed.R.Evid. 702. As the term "or" joins the requisites to be considered an expert, it is not necessary for the purported expert to possess all five requisites-as long as he possesses one, he may be deemed an expert. *See Cooper v. Laboratory Corp. of America Holdings, Inc.,* 150 F.3d 376, 380 (4th Cir.1998).

■ Schwartz' educational background lies in geological engineering. However, while at Princeton, Schwartz took a micro-macro mineral economics course. Nevertheless, as Schwartz graduated in 1977, this economics course was completed some twenty (20) years ago. *See id.* (giving little weight to a single toxicology course taken thirty years before the start of the litigation at which the witness was to testify as a toxicology expert); *see also* ROBERT S. PINDYCK & DANIEL L. RUBINFELD, MICROECONOMICS Preface, at xxi (4th ed.1998) (recognizing that over the past decade new topics, such as competitive strategy and the analysis of pricing by firms with market power, generally excluded from previous textbooks, have come to have a central role in economics today). Consequently, though the curriculum of geological engineering, including this sole course in mineral economics, may provide some insight to vermiculite mining and the constraints of a market due to nature, this curriculum cannot be assumed to provide its graduates with an economics background appropriately necessary to define a relevant market in an antitrust case. As such, Schwartz lacks the requisite educational background for an expert witness. Though the necessary degrees, titles or credentials do not govern by themselves the issue of qualifications, it cannot be denied that these accomplishments aid one in obtaining the requisite knowledge, and thus, are pertinent in determining whether an individual qualifies as an expert.

In regards to training, experience and skill, a substantial portion of Schwartz' career involves performing market analyses for his clients. The court does not doubt that Schwartz has prepared hundreds of these analyses and has given several presentations on such analyses throughout his career. Notwithstanding, Schwartz' market analyses generally are utilized "to define a market for investment purposes to best understand the ability to earn profits on different investments in different market situations." (Mar. 29 Daubert Tr. at 137.). In doing this, Schwartz asserts that he has addressed issues of market share and price discrimination, and has used the Merger Guidelines to define the bounds of the market. Though related to a relevant market determination in an antitrust issue, there are differences between an analysis for business investment and an analysis for antitrust purposes. For one, market analyses performed for business usually provide information regarding the various places a product would be sold, uses for which it might be sold, and the regions in which it might be traded. (Mar. 31 Daubert Tr. at

497.) These analyses do not go into the detail required for antitrust matters. For instance, defining where a product could be sold is only a small part of defining a geographic market as there can be relevant markets that are narrower or broader than where individual producers sell their products. (Mar. 30 Daubert Tr. at 223.) In addition, market analyses for antitrust markets generally require some expertise in the field of industrial organization. (Mar. 30 Daubert Tr. at 201.) Individuals with experience in defining markets for minerals generally would not possess the skill and training of a professional economist necessary to define a relevant market for antitrust purposes. (Mar. 30 Daubert Tr. at 202.) Moreover, Schwartz generally performs market analyses for the coal industry, which has an indefinite number of producers. However, the vermiculite market only maintains a handful of producers. As Schwartz' training, experience and skill lies with business market analyses for the coal industry or other utilities rather than antitrust issues, it cannot be determined that Schwartz possesses the requisite training, experience and skill.

Mr. Schwartz' level of training, experience and skill is substantially similar to the purported expert in *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791 (4th Cir. 1989). In *Kline*, the plaintiff utilized the testimony of a purported expert to establish that the defendant's shift in credit practices was an unjustified credit discrimination and price discrimination under Section 13(a) of the Robinson–Patman Act. The Fourth Circuit determined that the court abused its discretion by not excluding the testimony of this expert in light of the facts that: (a) "by her own admission," she was "not an economist;" (b) her general business education failed to indicate whether she possessed any training in antitrust or credit; (c) "[d]uring her entire career [she] had published only one article, a piece that had nothing to do with price discrimination, credit or antitrust generally;" and (d) "[h]er work experience was limited largely to analyses of companies'

financial health." *Id.* at 799–800. The court went on to hold that "no single one of these facts disqualifies [the expert] from giving opinions.... In combination, however, they lead us to the conclusion that this witness cannot satisfy even the minimal requirements of Fed.R.Evid. 702." *Id.* at 800. The court further declared:

> The witness did not possess "scientific, technical, or other specialized knowledge" that would assist the trier of fact, as required by Rule 702. This evidence should have been excluded; it was not merely to be accorded the reduced weight normally allowed less qualified testimony.

*Id.*

Grace asserts that like the purported expert in *Kline*, Schwartz does not possess the requisite expertise to testify in an antitrust case involving vermiculite. Schwartz has not taught in the antitrust economics field; he has not written in the field; though he has testified about market analyses, he never has testified about a relevant market, competitive impact, dangerous probability of monopolization, or market power in an antitrust case; and, last but not least, the expertise he claims to have acquired on antitrust matters has been through methods such as "discussions with attorneys with expertise in ... antitrust law." (Schwartz Dep. at 51; Mar. 6 Daubert Tr. at 235.) At the hearing, Schwartz admitted that in his twenty-three (23) years of performing market analyses, only five engagements involved antitrust product market analyses, a small percentage of his usual work. These five engagements were not antitrust cases, but were retentions in merger and acquisition cases that had the potential of being reviewed by either the Federal Trade Commission or the Department of Justice. (Mar. 6 Daubert Tr. at 221–22.) Moreover, though Schwartz keeps up to date on the field of geological engineering and mineral markets, Schwartz fails to keep up with the field of antitrust economics.

(Mar. 6 Dauber Tr. at 237.) VVL attempts to distinguish *Kline* by maintaining that the purported expert there lacked specialized knowledge in price discrimination or credit issues whereas, Schwartz possesses specialized knowledge in market definition and mineral economics. However, as already emphasized, there are stark differences between market analyses to forecast businesses' financial profitability and market analyses for antitrust purposes. Accordingly, the alleged specialized knowledge does not apply necessarily to antitrust matters. To determine whether Schwartz actually possesses such specialized knowledge applicable in antitrust matters, the court must undertake an examination of Schwartz' understanding of basic economic principles.

After reviewing the evidence presented to the court in the four day *Daubert* hearing, it appears to the court that Schwartz does not have the requisite knowledge to be qualified as an expert in antitrust litigation, as he lacks a clear understanding of basic economic principles. For instance, Schwartz admitted he was unfamiliar with the dominant firm theory in economics. This is a commonly used theory which attempts to explain the pricing and output levels in a market with a single large company, possibly a monopolist, and how it competes with smaller companies. Economists may choose to rely upon the dominant firm theory when determining if a company possesses monopoly power. Schwartz' inability to recognize the dominant firm theory emphasizes his lack of knowledge of current standards for applying antitrust economics.

Additionally, the term "joint products" was another concept about which Schwartz was unfamiliar in his deposition. Joint products are produced in relatively fixed proportions and are "linked in a single unit of production." (Goetz'Expert Aff. at 6.) The classic example of this is of beef and hide. In the beef-hide example, cows are the product being produced, but whatever byproducts come from a cow are sold sep-

arately. Similarly, mid-sized and small vermiculite also may be considered joint products because the different sizes of vermiculite are being produced at the same time. The joint products phenomena becomes prevalent in this case with Schwartz' mine imbalance problem. According to Schwartz, as the demand for mid-sized vermiculite surpassed the demand for small vermiculite, Grace discarded small vermiculite and increased the prices of mid-sized vermiculite to counteract its mine imbalance. (Schwartz Report at 16–17; Godek Expert Aff. at 6.) While analyzing the mine imbalance problem, Schwartz identified the different price patterns, but did not examine the cost changes. (Godek Expert Aff. at 6.) At the Daubert hearing, Schwartz distinguished joint cost from joint product market and stated that "[t]he fact that costs may be incurred at the same time does not mean that there are not separate uses and values for those products, and the evidence indicated quite clearly that, in fact, the products were used separately, were priced separately and were not correlated with each other." (Mar. 6 Daubert Tr. at 106–07.) However, when assessing the implications of a change in the price or in the quantity sold of one of the joint products, it is imperative to look at all of the joint products. Failure to do so indicates less than sufficient care when analyzing the connectedness of the joint production process.

Furthermore, Schwartz seems to be confused about the concept of price correlation. Correlation refers to how prices of different products move in relation to each other over time. In considering two different vermiculite concentrate size grades (what Schwartz has labeled as small and ultrasmall), Schwartz was unable to draw any conclusion about the price correlation of the two products as the prices did not change. He stated, "[the unchanging prices] provide[ ] no empirical evidence from a statistical basis of any kind to demonstrate that those two prices are, in

fact, correlated; it merely demonstrates that those prices are unchanged, not that they would move in the same direction, let alone by the same magnitude of correlation." (Mar. 6 Daubert Tr. at 108.) However, by simple definition, no change over the years in the two products' prices indicates perfect correlation. (Mar. 30 Daubert Tr., at 276.) As such, the stable prices of the separate vermiculite concentrate size grades and the constant differential found show correlation.

Lastly, Schwartz' lack of antitrust economic experience becomes apparent in his analysis of the elasticity of demand. The flat prices of vermiculite concentrate Grades 4 and 5 observed as the supply curve shifted implies that the demand curves were flat, i.e., very elastic. (Goetz' Expert Aff. at 11.) Introductory microeconomic courses teach that elastic demand curves imply that there are good substitutes for the product in question. Schwartz, however, concluded the exact opposite in his deposition and testimony at the Daubert hearing. He testified that elastic demand curves implied that no substitutes could be found for the product. This is an error.

Because of Schwartz' apparent failure to understand basic antitrust economic principles, the court cannot find that Schwartz maintains the minimal expert requirement of knowledge pursuant to Rule 702. The court recognizes that after a while, Schwartz was able to grasp some of these concepts enough to explain them in his own terms. However, the fact that he immediately did not recognize basic antitrust economic principles leads to the inference that there could be more complicated issues lurking under the surface. As such, the court determines that Schwartz does not have the specialized knowledge necessary to testify about antitrust matters. Nonetheless, the court will explain why Schwartz' methodology in arriving at his conclusions also disqualifies Schwartz as an expert witness in this case.

The Supreme Court has instructed courts that under Rule 702, trial judges must determine "whether the reasoning or methodology underlying the testimony is [ ] valid and [ ] whether that reasoning or methodology properly can be applied to the facts in issue." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Thus, there are two questions a court must answer before permitting an expert to testify: (1) Is the proposed testimony relevant to the issues in the case; and (2) Is the proposed testimony sufficiently reliable? In answering these questions, a court must take into consideration the fact that "Rule 702 was intended to liberalize the introduction of relevant expert evidence." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999); *see also Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) (recognizing that the test for exclusion of an expert is a strict one). As such, a court need not determine whether the expert's testimony is correct, but should leave such conclusions to the jury after "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786). Further, it is unnecessary for an expert to be precisely informed of all the details of a case to render an opinion. *See Kline*, 878 F.2d at 799. However, courts also must be mindful that experts have the potential to be misleading if their testimony is not reliable. Expert testimony with a greater potential to mislead than to aid the jury should be excluded. *See Westberry*, 178 F.3d at 261 (citing *United States v. Dorsey*, 45 F.3d 809, 815–16 (4th Cir.1995)).

### A. Relevance of the Proposed Testimony

In regards to the first question a court must answer, the proposed testimony of Seth Schwartz not only is pertinent to the present case, but focuses on the central issue. To establish a claim under Section

1 and 2 of the Sherman Act, a plaintiff must set forth a relevant market. *See Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.*, 714 F.2d 351, 355 (4th Cir. 1983). Generally, an expert is utilized in establishing the relevant market. *See* George A. Hay, *The Economist as Expert Witness, in Expert Witnesses*, 335 (Faust F. Rossi ed. 1991) ("[A]t the very heart of antitrust cases are concepts-such as monopoly power, restraints on competition, and relevant markets-that are as much matters of economics as they are of law. With very few exceptions, it is virtually unthinkable to attempt to litigate an antitrust case without the use of economic testimony"). As VVL was proffering the testimony of Schwartz to aid in defining the relevant market in the antitrust claims, Schwartz' testimony would assist the trier of fact in understanding this issue.

### B. Reliability of the Expert's Testimony

■ A district judge acts as a "gatekeeper" in determining whether an expert's purported testimony is reliable. Reliable expert testimony cannot be based on mere belief or speculation; rather, it must be based on scientific, technical, or, in this case, specialized knowledge derived from valid methods. *See Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786. To determine the reliability of specialized knowledge and methods for applying it to various facts, a court may consider such factors as testing, peer review, evaluation of rates of error, and general acceptability. *See id.* at 593–94, 113 S.Ct. 2786. The Supreme Court has held that these four factors outlined in *Daubert* do not confine a district court's assessment of whether a witness' testimony is reliable. Rather, a district court has considerable leeway in examining any number of factors in making the reliability determination. *See Kumho Tire Company, Ltd. v. Patrick Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999). Thus, "the court's evaluation is always a flexible one, and the court's con-clusions necessarily amount to an exercise of broad discretion guided by the over-arching criteria of relevance and reliability." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir.1999).

■ There is no doubt that Schwartz could be qualified as an expert in areas relating to mineral rights outside of antitrust issues. However, when it comes to issues involving antitrust economics, Schwartz' methodology is flawed on several bases. As best described by Professor Goetz, "economics is based upon a formal body of learning and expertise." (Mar. 31 Daubert Tr. at 496.) Antitrust economics can be analogized to a multi-step mathematical problem in that when one of the necessary steps "either misapplies a mathematical theorem or does the arithmetic wrong, you know that the answer [may be] wrong without following the rest of the chain or indeed without calculating the correct answer yourself . . . You know that the methodology is wrong and the answer could be correct only by happenstance." (Mar. 31 Daubert Tr. at 496.) Schwartz skips a number of steps in his analysis of antitrust issues.

For instance, when performing an economic analysis, it is imperative to identify alternative hypotheses to the proposed hypotheses. To determine if Grace was a monopolist, Schwartz utilized the Merger Guidelines which require analysis of whether a seller can raise prices profitably over competitive prices for a significant period of time. Pointing to a series of considerable increases in Grace's price for mid-sized vermiculite, Schwartz declared that Grace was, in fact, a monopolist, at least in Schwartz' defined product market for mid-sized vermiculite. (Mar. 6 Daubert Tr. at 125–26; Goetz' Expert Aff. at 4.) Traditionally, a monopolist, with a downward sloping demand curve, increases its prices, which reduces its output. (Mills' Expert Aff. at 7.) In this analysis, however, Schwartz failed to look at the alternative hypotheses. (Mar. 31 Daubert

Tr. at 499; Goetz' Expert Aff. at 3.) For example, an observed price increase may result from a rightward shift of a demand curve, a leftward shift of a supply curve, or a combination of these two movements. (Goetz' Expert Aff. at 4–5.) Schwartz merely pointed to the price increase as an indication that Grace possessed monopoly power without further investigation as to how the price increase occurred. It is improper to conclude that a company such as Grace has market power by pointing to its price increases without further testing of alternative hypotheses.

Schwartz makes similar conclusions based on price increases, without considering explanations for the increases, in defining the product market in vermiculite concentrates as sub-markets. In relation to the Section 2 claims, Schwartz concluded that for each grade size, there was a separate relevant product market. Schwartz asserts that he made his decision to bifurcate vermiculite concentrate by size based on a number of factors including, but not limited to, the changes in the prices of the various sizes of vermiculite over time, analysis of specific users for the individual products, and overlap among the grades in the end use of the products. However, Schwartz failed to show that the prices of the different vermiculite sizes were free of each other. It is possible that two products with different dominant uses are in the same market if a conservative price change pushed users to switch products; not all users need to switch, but only enough need to switch to significantly affect prices. (Mill's Expert Aff. at 6.)

Schwartz not only failed to consider the substitutability of vermiculite sizes, which would affect whether the sizes' prices were free and clear of one another; but, he also failed to thoroughly consider the substitutability of other products. According to Black's Law Dictionary, the relevant market in an antitrust case includes both the product market and the geographic market. The geographic market must be "composed of products that have reasonable interchangeability for purposes for which they are produced, confining their price, use and quality." *See* BLACK'S LAW DICTIONARY 1291 (6th ed.1990). Schwartz, in his market analysis, did not thoroughly examine substitutes when defining the market. For example, vermiculite competes with polystyrene in the manufacture of construction materials and perlite in some horticultural capacities. It is necessary to determine whether these products belong in the same antitrust market as vermiculite. (Mill's Expert Aff. at 3.) When Schwartz considered substitutes in his analysis by looking at price correlation to determine whether or not different products were in the same market, he focused on finding the perfect substitute for vermiculite. Hence, Schwartz excluded products such as perlite in defining the market. By doing this, Schwartz gave the inflexible buyers, unable to substitute vermiculite despite price increases, too much weight and ignored the power of the flexible elastic buyer. There are elastic buyers that will find substitutes, even if the substitutes are imperfect. An example to further illustrate this point would be butter and margarine. Most people would agree that butter and margarine are not perfect substitutes. Their prices have not necessarily moved together in the past, and they have a substantial price differential. (Mar. 31 Daubert Tr. at 510.) There are butter buyers and margarine buyers that, regardless of price increases, would never switch products. However, if there are enough regular butter buyers that would switch to margarine if butter prices increased, then margarine would be in the same relevant market as butter. It is not imperative that every butter user switch to margarine. There just need to be enough butter buyers that switch to margarine so that the butter producers' profits would be significantly affected. In the present case, if substitutes do exist to which a number of elastic buyers would switch, and the switching would restrain the price of vermiculite, then these substitutes would be included in the relevant market. Schwartz

failed to consider this aspect in his analysis of substitutes.

Not only does the potential for a high rate of error exist because Schwartz neglected to analyze or misapplied some of the steps, but the potential for a high rate of error exists because of the testing method selected by Schwartz in determining a relevant market. In defining a relevant market for the present case, Schwartz utilized the method set forth by Merger Guidelines, which consider whether a hypothetical monopolist could raise prices by 5 to 10 percent. Schwartz utilized this method despite the fact that the Guidelines state: "Because the specific standards set forth in the Guidelines must be applied to a broad range of possible factual circumstances, mechanical application of those standards may provide misleading answers to the economic questions raised under antitrust laws." Merger Guidelines, § 0. Schwartz himself admits that the Merger Guidelines are not the "be all or end all of relevant market analysis." (Mar. 29 Daubert Tr. at 99.) Even with such knowledge, Schwartz did not undertake another method of testing, such as the Elzinga–Hogarty test, to support his conclusion of a relevant market under the Merger Guidelines. Thus, Schwartz utilized a testing method that under its own statement of purpose suggests that there could be a high rate of error when used in antitrust matters.

Moreover, Schwartz makes several other errors that would not be generally accepted by antitrust economists. In relation to the plaintiffs' Section 1 claims, Schwartz began his analysis with the hypothesis that the proper relevant market was mining rights in Louisa County. By defining the relevant product market as mining rights, Schwartz neglected the fact that mining rights obtain their value from the downstream product of vermiculite concentrates. Schwartz admitted during the hearing that the value of mining rights could not be calculated without considering the value of vermiculite concentrates. Accordingly, the court cannot accept Schwartz initial hypothesis for the relevant product market. This error also contributed to a faulty relevant geographic market. In determining the geographic market, Schwartz evaluated the existing and potential buyers of vermiculite reserves, whereas he should have evaluated the existing and potential buyers of vermiculite concentrates. By Schwartz' own admission, the relevant geographic market for vermiculite concentrates is, at a minimum, North America. The alleged North American vermiculite concentrate market further illustrates the error in Schwartz' methodology in defining Louisa County as the geographic market for mining rights. These two markets are incongruent with one another. Yet, it is generally accepted that "the same firms that discipline the pricing of vermiculite concentrate are those firms and those products that discipline the pricing of the reserves." (Mar. 30 Daubert Tr. at 289.) If a mining rights market exists, its geographic market should be co-extensive with the market for concentrates unless there is some economic analysis to show that it is not. Schwartz failed to present such an economic analysis.

Additionally, Schwartz included the transportation costs and building costs for a new plant in determining the proper geographic market for vermiculite mining rights. Though such costs may make it more difficult for VVL to compete in the market, it does not foreclose other entrants. Indeed, there is evidence that the mines in Montana now are producing vermiculite without asbestos. Schwartz failed to consider this factor basing his exclusion of such evidence on the fact that the company mining in Montana may go into bankruptcy. Even though this may be true, it does not change the fact that the mine is producing vermiculite which one day may influence prices in the market. (Mar. 31 Daubert Tr. at 471.)

Further, in the Section 2 claim, Schwartz defined the geographic market as North America. Schwartz, however, neglected to review the effects of overseas producers, especially large volume producers such as South Africa. In determining whether importers affect the market it is important to assess whether significant amounts of vermiculite concentrate are imported, and then are substituted for domestic vermiculite. The crucial element to consider is if imports have a price-restraining influence on domestic vermiculite. Schwartz concluded that because of the high transportation costs, the overseas importers could not affect the domestic market, without examining whether the importer's vermiculite was being substituted for domestic vermiculite. The fallacy in this analysis is brought into stark reality when one considers the undisputed evidence that importation of vermiculite not only has existed for some time, but shows a trend of increasing importation.

Schwartz also concluded that the vermiculite market would feel the anticompetitive effects of the donation to HGSI some seven years after the transfer. This time frame was based on reserve studies performed around the time of the donation. Since then, it has been determined that VVL will not run out of reserves until after the year 2013. In concluding that anticompetitive effects will not occur until the future, Schwartz testified that he looked at "the available supply of reserves to the marketplace and whether or not the loss of production due to depletion of reserves can today be reasonably expected to have a significant impact on the market at that point in the future." (Mar. 29 Daubert Tr. at 23.) In determining that it would have an impact, Schwartz assumed that the market would remain stable over the next several years. However, this is a faulty assumption in light of the fact that in the years prior to the donation, the market did not remain stable. As such, there is no evidence that the market would suddenly stabilize over the next several years. Once again, this assumption neglects to consider that there may be other substitutes that may enter the market between the time of the transfer and the projected year that competition will suffer due to the transfer. Schwartz admits that "factors such as new uses for vermiculite [may] be found in which it would be a superior product and bring greater efficiencies to the marketplace that at the current point in time could equally offset any new substitution by other new improved products," and that "the farther out in the future you go, the less certain any type of forecast or prediction can be." (Mar. 29 Daubert Tr. at 45).

To further illustrate that Schwartz' methodology would not be generally accepted, Schwartz, while labeling Grace a monopolist, applied a defective definition of monopoly power. A seller with monopoly power is one that raises its prices above competitive prices as it decreases its output. (Mills' Expert Aff. at 7.) It is important to note that the monopolist decreases production below its capacity as it increases prices. Schwartz, however, declared that a seller that produces output at its full capacity and that increases prices with increases in demand is a monopolist. (Mills' Expert Aff. at 7.) The conclusion by Schwartz does not follow the correct economic definition of monopoly.

Beyond the methodology utilized in determining a relevant market and Schwartz' numerous errors, the court in this case must also consider the fact that there is at least an underlying, though probably unintentional, potential for bias. It is imperative for expert witnesses to be independent. The check to determine that most experts are unbiased is whether their testimony is consistent with their scholarly work, prior published testimony, and reputation. (Mar. 30 Daubert Tr., at 205.) In the present case, because Schwartz lacks

such scholarly work and prior testimony, such a check on Schwartz' potential bias cannot be undertaken. Combined with the fact that Schwartz has worked with Sansom, VVL's president, since the time Schwartz earned his degree at Princeton, the potential for bias increases to some degree.

Such bias may be interposed into Schwartz' testimony inadvertently. For instance, Schwartz composed his own data in the Merger Guidelines calculation because he rejected the data comprised by the United States Geological Survey ("USGS") as badly flawed in the area of statistics on production and consumption of vermiculite as well as on the presence of vermiculite reserves. Schwartz collected his own data on production and sales in vermiculite from participants in the market for domestic vermiculite in the United States. In comparing his own data to the data of the USGS, Schwartz concluded that the USGS data "was not just wrong, in terms of mathematically wrong, but would lead to opposite conclusions regarding what the trends and constraints were in supply and demand for vermiculite in the market." (Mar. 6 Daubert Tr. at 63.) Moreover, Schwartz determined that the "USGS information on the reserves of vermiculite was even more badly flawed than their data on production of sales of vermiculite." (Mar. 6 Daubert Tr. at 64.) Because Schwartz was the only purported expert in this case not to rely on the USGS data, Schwartz concluded that all of the other experts in the case relied on improper data in forming their definitions of a relevant market. However, Schwartz' data is derived from his interviews with other individuals. Deriving analyses in the antitrust field from anecdotal evidence of this nature is a basis for manifest error, particularly when compared to the detailed survey of USGS. For these reasons, the court must be extra cautious when there is a potential for bias.

## III.

After considering all of the evidence put forth during the four day Daubert hearing, this court finds that it cannot qualify Seth Schwartz as an expert in antitrust economics. First, Schwartz lacks the minimal requirements of education, training, skill, experience, and knowledge to qualify him as an expert in antitrust economics under Rule 702. Additionally, the court construes Schwartz' methodology to be unreliable. The testing method Schwartz utilized, by its own terms, admitted there was a potential for error in antitrust matters. Additionally, Schwartz' lack of knowledge in antitrust matters caused him to exclude a number of steps that most experts in this field would find necessary in defining a relevant antitrust market. Moreover, because Schwartz closely works with VVL's president, there is a potential for bias in his testimony. For the foregoing reasons, this court grants the defendants' motion to exclude the report and testimony of Seth Schwartz.

An appropriate order this day shall follow.

### ORDER

Upon consideration of the defendants' joint Motion to Exclude the Report and Testimony of Seth Schwartz, the plaintiffs' proposed market analysis expert, it is hereby

### ADJUDGED AND ORDERED

that the joint motion shall be, and it hereby is, GRANTED.