**BERLYN, INC., Montgomery Sentinel Publishing, Inc., Kenneth C. Rossignol, Plaintiffs,**

v.

**The GAZETTE NEWSPAPERS, INC., the Washington Post Co., the Baltimore Suburban Press Network, Defendants.**

**No. CV S–01–606.**

United States District Court, D. Maryland.

Aug. 13, 2002.

George W. Liebmann, Law Office, Melvin J. Sykes, Law Office of Melvin J. Sykes, Baltimore, MD, for Plaintiffs.

William J. Kolasky, Alice M. Stoeppelwerth, Fiona W. Huang, Kyles M. DeYoung, Wilmer Cutler and Pickering, Washington, DC, David P. Donovan, Wilmer Cutler and Pickering, Tysons Corner, VA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

SMALKIN, Chief Judge.

This case is before the Court on the defendants' motion to exclude the testimony of James B. Shaffer, whom the plaintiffs have designated as an expert qualified to testify to relevant matters in this case.

The plaintiffs are Berlyn, Inc. (Berlyn), Montgomery Sentinel Publishing, Inc. (Sentinel), and Kenneth C. Rossignol (Rossignol). Berlyn is wholly owned by Lynn Kapiloff (Kapiloff) and her husband. Kapiloff has served as the CEO and primary

manager of Sentinel's newspapers in Montgomery and Prince George's Counties (the *Montgomery County Sentinel* and the *Prince George's Sentinel*) since December 1987. Plaintiff Rossignol publishes *St. Mary's Today,* a weekly paid newspaper published in Lexington Park, Maryland, which has a circulation of approximately 5,000, with most subscribers and advertisers located in St. Mary's County, Maryland.

The defendants in this case are The Washington Post Company (the Post), The Gazette Newspapers, Inc. (Gazette), and Baltimore Suburban Press Network, Inc. (Press Network). The Post is a publicly-held Delaware corporation. One of its operating units publishes the *Washington Post* newspaper. The Post owns all the stock of Gazette, but requires that Gazette operate as an independent entity. Gazette is a Maryland corporation that publishes approximately 44 newspapers in Montgomery, Frederick, Prince George's, Calvert, Charles, and St. Mary's Counties.

Press Network is a Delaware corporation which offers regional and national advertisers a "one contact/one bill" method of placing advertising in multiple newspapers around Washington, D.C.

The plaintiffs Berlyn and Sentinel operated the *Prince George's Sentinel* in that county and received advertising clients through defendant Press Network. Eventually, Gazette launched publications in Prince George's County as well, and Press Network, which is half owned by Gazette, began recommending that advertisers direct their business to Gazette's publications instead of Sentinel's. The plaintiffs allege that the defendants' conduct amounts to an unreasonable restraint on trade, a conspiracy and an attempt to monopolize, unfair competition, breach of contract, and tortious interference. Also at issue is the defendants' acquisition of the Southern Maryland Division of The Chesapeake Publishing Company, which the plaintiffs argue resulted in a violation of Section 7 of the Clayton Act.

The events which gave rise to the plaintiffs' claims will be described with greater detail in the Opinion dealing with the defendants' motion for summary judgment, where the specific facts of this case are of greater importance. Clearly, the facts now relevant deal with Shaffer's qualifications to testify as an expert and the reliability of his opinions.

The defendants seek to prevent Shaffer from offering three opinions: (1) that the relevant product market, for antitrust purposes, is community newspapers and the zoned editions of metropolitan newspapers, and that the relevant geographic market is defined by county; (2) that, in a predatory pricing analysis, the value of certain of the Post's assets should be taken into account when determining whether the defendants were pricing below marginal cost; and (3) that Berlyn suffered lost profits, estimated between $700,000 and $850,000, as a result of Press Network's activities from 1997 to the present.

I. *Shaffer's Background*

Shaffer, a long-time friend of the Kapiloffs, was employed in the newspaper business from 1970 to 1998. His only employment in Maryland involved a two-year stint from 1977–1979 at Stromberg Publications, the publisher of 13 weekly newspapers in Baltimore, Carroll, and Howard Counties. He considers himself an expert in the business side of the newspaper business.

Shaffer is not an economist or attorney by education, training, or experience, and, upon his first deposition in November, 2001, he had almost no knowledge of antitrust economics. His undergraduate de-

gree was in engineering. He took a few economics courses between 1967–1969, after which he received a master's degree in business administration with a financial specialty from Indiana University. He has no other training in economics.

Shaffer has never published anything related to economics or the law of antitrust, nor has he taught any courses in either field. He subscribes to no journals (and, upon his first deposition, knew of no journals) that cover antitrust law or antitrust economics. He did not know what journals might be helpful in a case like this. He has read only the articles provided to him by plaintiffs' counsel.

Before this case, Shaffer had never performed a relevant market analysis. He was not conversant with economic formulae; he said if he spent enough time, he thought he "could figure [them] out," but that he would have to "go back to ... college textbooks and dig out some of the chapters on those kinds of equations." He was unfamiliar with basic terminology and concepts used by economists who deal with antitrust issues. Shaffer has never testified as an expert in economics or antitrust damages, and he has never been qualified as an expert on any subject in any court.

Shaffer, however, has performed and reviewed predatory pricing analyses for major national newspapers throughout his career. His positions with these newspapers were prominent, requiring a high level of business and financial sophistication. Shaffer served, for example, as Vice President and Chief Financial Officer (CFO) of The Los Angeles Times, Executive Vice President and CFO of the Sun Times Company (Chicago), and Chief Executive of Guy Gannett Communications. Shaffer also has taught media economics and newspaper costs and pricing structures at various colleges and universities throughout his career.

II. *A Brief History of Shaffer's Relevant Market Opinion*

Shaffer's first opinion, dealing with relevant market, and his knowledge of that subject have evolved over the course of litigation. At his first deposition on November 20, 2001, Shaffer demonstrated that he had just recently been exposed to antitrust economics and was unfamiliar with several economic terms.[1] Shaffer

1. Shaffer's deposition testimony makes clear that it wasn't until just days before being deposed that he had ever read about some of the crucial economic issues in this case. When asked to "define the relevant market for antitrust purposes," Shaffer replied, "You asked that question, and I was asking for some definition, because I know of relevant market ... primarily from what I read of the materials that you saw earlier, so you're basically asking me to parrot ... back something that I've just learned just over the last few days." Shaffer Dep. I at 215. Shaffer's lack of knowledge as to other specific economic issues was apparent later in the deposition:

Q. What is a diversion ratio for market definition purposes?

A. I don't know.

Q. Have you ever heard of the Elzinga–Hogarty procedure for a geographic market definition?

A. I have not.

Q. Do you know what the price correlation test for market definition is?

A. No.

Q. Do you know how an economist would define market power?

A. I read some things about that in the material that you saw this morning, and from that I can tell you I do not know how an economist would define it, but I intend to investigate that further.

Q. Do you know how an economist goes about diagnosing the presence or absence of market power?

A. No. Although, again, I did see some tests. I mean, you will see in that literature that you saw this morning there will be tests that give some bullet points about the presence or absence of market power, and so I would—I'm not an economist, but I would start with that list.

Dep. I at 165. Shaffer indicated, however, that he intended to study materials dealing with economics and relevant markets furnished to him by plaintiffs. On March 15, 2002, after this first deposition, Shaffer submitted an affidavit concluding that "the relevant product market for purposes of pricing and monopolization analysis [is] the market consisting of weekly community papers and the weekly zoned editions of daily papers, and that the relevant geographic market [is], in this instance, a market defined by county." Shaffer Aff. I at 3, ¶ 11. From all outward appearances, Shaffer made this conclusion based on a simple review of documents: "Subsequent inspection of the newspapers concerned and of documents confirms this view, as do recognized studies." *Id.*

After offering this opinion, Shaffer was deposed again, and he admittedly was just beginning to learn how to approach the questions of this case from an economist's viewpoint. Shaffer Aff. II at 116. Shaffer had not done any independent research on relevant markets and was relying on the plaintiffs' attorneys to furnish him with economic literature to study. *Id.* at 116–17.

Finally, after the defendants challenged his qualifications, Shaffer submitted a supplemental affidavit. This affidavit again expressed his conclusion that the relevant markets were community newspapers and the zoned editions of metropolitan newspapers (product market) and individual counties (geographic market). Although he had already reached this conclusion in his first affidavit, he explained in this second affidavit that, since his first two depositions, he had reviewed numerous deposition transcripts and exhibits submitted during discovery in this case.

### III. *Standards for Admitting Expert Testimony*

> Under Federal Rule of Evidence 702, if specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In short, a two-step inquiry is relevant here: (1) whether the witness is qualified, and (2) if qualified, whether his opinion is reliable, in that it is based on sufficient facts and sound methodology.

#### (A) *Witness Qualifications*

This first prerequisite demands that the witness have specialized "knowledge, skill, experience, training, or education" regarding the subject to which he will offer an opinion. FED. R. EVID. 702. As the Fourth Circuit has pointed out, "[t]he witness' qualifications to render an expert opinion are ... liberally judged by Rule 702." *Kopf v. Skyrm,* 993 F.2d 374, 377 (4th Cir.1993). Indeed, when a witness's qualifications are challenged,

> the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered. One knowledgeable about a particular sub-

Q. I take it you're not familiar, then, other than what you've read, or what you were supplied with by Mr. Sykes, with any standard reference literature on the presence or absence of market power; is that correct?
A. Correct.
*Id.* at 226–28.

ject need not be precisely informed about all details of the issues raised in order to offer an opinion.

*Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir.1989).

However, the Court must not accept without scrutiny any witness with knowledge of a topic greater than that of the jury's. In *Kline*—a case particularly relevant here due to its convergence of expert testimony and antitrust issues—the Fourth Circuit held that the trial court abused its discretion in permitting a witness to testify as to whether the defendant's shift in credit practices was unjustified credit discrimination and price discrimination under § 13(a) of the Robinson–Patman Act. *Id.* The witness (who was employed as a professional expert) held a master's degree in business administration, but was not an economist. *Id.* She had published only one article in her career, but the piece had no relevance to the issues on which she was to testify. *Id.* Her work experience and experience as an expert witness had only tenuous relation to credit decisions and antitrust. *Id.* Moreover, she was admittedly unfamiliar with certain basic concepts related to credit discrimination. *Id.*

In reversing the trial court, the Fourth Circuit explained:

> Certainly no single one of these facts disqualifies [the witness] from giving opinions about the legitimacy of the justifications for [the defendant's] credit decisions. In combination, however, they lead us to the conclusion that this witness cannot satisfy even the minimal requirements of Fed. R. Evid. 702. There was no indication, for example, that [her] general business education included *any* training in the area of antitrust or credit. Similarly, [the witness] admitted that she lacked *any* other experience in such matters. Although it would be incorrect to conclude that [her] occupation as a professional expert alone requires exclusion of her testimony, it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying.

*Id.* at 800.

*Kline* was recently examined in *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn. & the Historic Green Springs, Inc.*, 98 F.Supp.2d 729 (W.D.Va.2000). In that case, the district court held that a proposed expert was unqualified to offer an opinion as to relevant market due to his lack of training and expertise in economics and antitrust and that the proposed expert's testimony was unreliable due to methodological flaws. *See id.* at 732–35, 736–40. The plaintiffs (competitors of the defendant mining company) sued on state and federal antitrust grounds. The plaintiffs designated Mr. Seth Schwartz as a purported expert witness on market analyses, and Schwartz offered an expert opinion as to the relevant market for antitrust purposes. Schwartz's educational background was in geological engineering, which included a course in "micro-macro mineral economics." He had "devoted most of his professional career to advising energy companies about various matters, some of which required [him] to perform market research analyses, including identifying and forecasting prices as well as business analyses for investment decisions." *Id.* at 730. In his business role, Schwartz had prepared market analyses for numerous businesses, which were used "to define a market for investment purposes to best understand the ability to earn profits on different investments in different market situations." *Id.* at 732. Although Schwartz had testified as an expert in numerous non-antitrust cases, "none of these cases involved antitrust

matters requiring the rigorous defining of a relevant market." *Id.*

As to Schwartz's education, the court explained that "though the curriculum of geological engineering, including [the] sole course in mineral economics, may provide some insight to vermiculite mining and the constraints of a market . . ., this curriculum cannot be assumed to provide its graduates with an economics background necessary to define a relevant market in an antitrust case." *Id.* As for Schwartz's experience in generating market analyses, the court explained that "[t]hough related to a relevant market determination in an antitrust issue, there are differences between an analysis for business investment and an analysis for antitrust purposes." *Id.* Relying on *Kline,* the court found that Schwartz lacked the necessary qualifications to testify as an expert on antitrust issues.

■ Thus, it is clear that although this first prerequisite (specialized knowledge, skill, etc.) is to be applied liberally, general business experience unrelated to antitrust economics does not render a witness qualified to offer an opinion on complicated antitrust issues such as defining relevant markets.

(B) *Reliability of the Opinion*

The second prerequisite to admissibility is the reliability test embodied in Rule 702 and recently developed through *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In applying this rule, the Court acts as a gatekeeper to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Daubert,* 509 U.S. at 588, 113 S.Ct. 2786; *see Kumho,* 526 U.S. at 141, 119 S.Ct. 1167 (holding that *Daubert* "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge"). Even if a witness is qualified to offer an expert opinion, that opinion can be excluded if it is based on inadequate facts or flawed methodology. As noted by the Supreme Court, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The Fourth Circuit has explained further that "[w]hen the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." *Tyger Constr. Co. v. Pensacola Constr. Co.,* 29 F.3d 137, 144 (4th Cir.1994).

Courts also must consider whether the principles and methods used by the experts in reaching his opinions are reliable, and whether the expert has applied the principles and methods faithfully to the facts of the case. In making this assessment, this Court must "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 200 (4th Cir. 2001) (quoting *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167).

IV. *The Court's Discretion*

In applying the above standards, this Court may exercise wide discretion in admitting or excluding proposed expert testimony. *See Gen. Elec. Co.,* 522 U.S. at 142, 118 S.Ct. 512; *United States v. Dorsey,* 45 F.3d 809, 814 (4th Cir.1995). As noted above, a witness's qualifications are liberally judged under Rule 702. *See Kopf,* 993 F.2d at 377. Indeed, Rule 702 was drafted

and adopted "to relax traditional barriers to expert opinion testimony." 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 702.02[1] (2002). Of course, expert testimony in general, and a witness's qualifications in particular, also must be judged in light of the potential for the finder of fact to accept blindly the testimony of a witness who the Court has qualified as an expert. *See Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." (citation omitted)); *Dorsey,* 45 F.3d at 815–16 (quoting *Daubert* ).

With this evidentiary framework in mind, the Court now must consider whether Shaffer may offer the opinions in dispute.

V. *Shaffer's Relevant Market Opinion*

Defining the relevant market is essential to the plaintiffs' antitrust claims. The relevant market generally can be defined as the "framework within which the competitive impact of conduct is assessed." 2 JULIAN O. VON KALINOWSKI, ANTITRUST LAWS AND TRADE REGULATION § 24.01[1] (2002), and a reliable definition of relevant market is an obvious prerequisite to determining whether a defendant has market power. A relevant market in antitrust analysis consists of a product market and a geographic market. The relevant product market identifies the products that compete with each other as defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The relevant geographic market is defined as "the area in which buyers or sellers of the product effectively compete," *Consul, Ltd. v. Transco Energy Co.,* 805 F.2d 490, 495 (4th Cir.1986), and the area "to which their customers could practicably turn for alternative sources of such products." *M & M Med. Supplies & Serv. v. Pleasant Valley Hosp.,* 981 F.2d 160, 170 (4th Cir.1992). Defining such specific product and geographic markets is no simple task. *See, e.g., Cogan v. Harford Memorial Hosp.,* 843 F.Supp. 1013, 1020 (D.Md.1994) ("To allow a jury to make a finding as to the geographic market, [the plaintiff] must provide the Court with expert testimony on this highly technical economic question."); *Victus, Ltd. v. Collezione Europa U.S.A., Inc.,* 26 F.Supp.2d 772, 786 (M.D.N.C.1998) (noting that defining relevant product markets is a "difficult economic question").

Shaffer's proposed opinion, which he set forth in his first affidavit of March 15, 2002, and reaffirmed in his second affidavit of June 11, 2002, is "that the relevant product market for purposes of pricing and monopolization analysis was the market consisting of weekly community papers and the weekly zoned editions of daily newspapers, and that the relevant geographic market was, in this instance, a market defined by county." Shaffer Aff. I, at 3, ¶ 11.

Shaffer is not qualified to offer this opinion. Shaffer's background is completely devoid of specific education, training, or experience in economics or antitrust analysis. His education is in engineering and business administration. Admittedly, his experience is in "the business side of the newspaper industry," and not in antitrust or economic analysis. He has never performed a relevant market analysis for antitrust purposes, and at the time he was retained as an expert in this case, he was

entirely unaware of how an economist would perform such a study. Clearly, Shaffer cannot qualify under the general requirements of Rule 702, which requires "knowledge, skill, experience, training or education."

Nor can Shaffer survive under any reading of *Thomas Kline, Inc., supra,* in which the Fourth Circuit held that it was an abuse of the trial court's discretion to allow a witness to offer expert testimony as to unlawful credit practices when the witness only had a master's degree in business administration and no personal experience in making credit decisions. 878 F.2d at 799–800. This case is clearly analogous as the plaintiff intends to establish relevant market through Shaffer, whose highest level of education is an MBA, who has minimal formal training in applied economics, and who admittedly has no experience in performing relevant market analyses. *See also Va. Vermiculite,* 98 F.Supp.2d at 733 ("[M]arket analyses for antitrust markets generally require some expertise in the field of industrial organization. Individuals with experience in defining markets for [a given product] generally would not possess the skill and training of a professional economist necessary to define relevant market for antitrust purposes.").

Plaintiffs assert that Shaffer has taught "media economics" at various colleges, universities, or professional schools of journalism. There is, however, no evidence that such courses involved analysis of relevant markets for antitrust purposes. Moreover, unlike this Court, these institutions need not apply the criteria of Rule 702 in deciding who will teach their students.

Shaffer's extensive background in the publishing industry certainly qualifies him to offer expert opinions as to the "business side of the newspaper industry." However, it does not give him license to offer opinions as to antitrust economics and relevant market analysis simply because these topics relate to newspapers in this particular case. The experience one has in a given trade, however extensive and however closely related to the "business side" of that industry, does not render one presumptively qualified to define that industry's relevant markets. *See Thomas Kline, Inc.,* 878 F.2d at 799–800; *Va. Vermiculite,* 98 F.Supp.2d. at 732–33, 736.

It is clear from the record that the plaintiffs anticipated that Shaffer would be able to learn the necessary mechanics of performing a relevant market analysis simply by reviewing the texts and articles they presented him. This clearly is a flawed approach, considering that Shaffer has had no formal training or actual experience in the area. Shaffer's experience in the publishing industry and his training and education in business does not make him especially capable of becoming an expert and learning the complex mechanics of antitrust economics within a few days (Shaffer stated in his second deposition that he worked ten days on this case, and that half of that time was devoted to work on his damages analysis, Shaffer Dep. II at 99–100). To accept Shaffer as an expert on this issue would be to recognize that, with minimal training and experience in antitrust economics, a person can *become* qualified to offer an expert opinion on the complex topic of defining relevant markets by applying himself to the topic for five or fewer days. The Court makes no such finding, and, for the reasons stated above, concludes that Shaffer is entirely unqualified to offer an opinion as to market definition.

Even if Shaffer were properly qualified by knowledge, skill, experience, training, or education, the plaintiffs have offered no evidence to show that his opinion is based on proper facts and data and that

his methods in forming his opinion are reliable. Shaffer initially set forth his opinion as to the relevant product market in his first affidavit of March 15, 2002. According, to his second deposition, however, which took place on April 4, 2002, this conclusion was based on extremely thin and unscientific data. Shaffer based this opinion to a great extent on his own experience in the newspaper industry, drawing on instinct and intuition to patch holes in his methodology that properly should be filled with specific facts, research, and established economic principles.

Plaintiffs now argue that the lack of data at that time is moot because Shaffer now has reaffirmed these conclusions, after reviewing portions of deposition testimony and exhibits produced in discovery. According to the plaintiffs' opposition and Shaffer's final conclusion as set forth in his supplemental affidavit, his final opinions as to relevant market were based on: (1) review of the deposition testimony of several witnesses in this case, most of whom work for the Post or Gazette; (2) review of market studies completed by the defendants; (3) a visual review of the newspapers involved; and (4) unspecified "independent market analyses." All of this was colored by (indeed it relies upon) Shaffer's extensive experience in the publishing industry and his recent review of economics articles provided to him by the plaintiffs. The plaintiffs make no reasonable attempt to explain how this is a reliable methodology for defining a precise product or geographical market. Indeed, the lack of any specific and independent market research seems to indicate a decidedly unreliable route to determining the specific outer boundaries of markets. *See, e.g., Va. Vermiculite,* 98 F.Supp.2d at 736–37 (discussing the complex research methods typically utilized in defining relevant markets); *Victus, Ltd.,* 26 F.Supp.2d at 786 (same). Plaintiffs have offered no evidence that the methods Shaffer drew upon to reach his ultimate conclusion are of the type that other experts would use to determine the relevant markets in an antitrust case.

The plaintiffs make much of statements in the *defendants'* internal memoranda and deposition testimony which indicate that the defendants' independent market research reaches the same conclusion as Shaffer as to market definition. There is no indication, however, of the methods used to reach these conclusions or whether these market surveys were compiled with an eye toward determining relevant market *for antitrust purposes.*[2] To the extent that Shaffer relied on market research done by defendants or statements by the defendants regarding their perceptions of competition, market, and the like, there is no indication that these assessments were based on proper research methods.

In sum, aside from drawing on his own experience when reviewing the discovery materials in this case, Shaffer's methods are wholly lacking in independent research. There is absolutely no evidence now before the Court that indicates that Shaffer's opinion is the product of reliable

2. *See Va. Vermiculite,* 98 F.Supp.2d at 732–33 ("Though related to a relevant market determination in an antitrust issue, there are differences between an analysis for business investment and an analysis for antitrust purposes. For one, market analyses performed for business usually provide information regarding the various places a product would be sold, uses for which it might be sold, and the regions in which it might be traded. These analyses do not go into the detail required for antitrust matters. For instance, defining where a product could be sold is only a small part of defining a geographic market as there can be relevant markets that are narrower or broader than where individual producers sell their products.").

principles and methods, and is based upon sufficient facts or data. For these reasons, the Court will exclude Shaffer's proposed opinions as to relevant product and geographic markets, and, thus, market power *vel non.*

VI. *Shaffer's Pricing Opinion*

The defendant also claims that the Court should exclude the following opinion:

> Assuming The Post purchased its presses and equipment partly for the purpose of zoning legal advertisements, then (a) an unspecified portion of the press and equipment costs should be considered in determining whether The Post's pricing for certain trustee advertisements was above marginal costs, and (b) The Post's pricing for trustee advertisements in Washington, D.C. for an unspecified period of time would not be above marginal costs.

Def.'s Mot. to Exclude at 8 (citing Shaffer Depo. II at 149–50).

Shaffer is qualified to offer his opinion as to pricing below marginal costs, which is relevant to plaintiffs' claims of predatory behavior. Shaffer has conducted and reviewed predatory pricing analyses for several major publications. He has studied finance and business administration and has served as a senior financial executive for several prominent companies. Moreover, from a review of the record, it appears that Shaffer's teaching experiences specifically deal with topics such as newspaper costs and price structuring. He is thus qualified by training and experience to offer the above opinion.

As for Shaffer's methods, the defendants identify specific steps which they believe Shaffer should have taken in reaching his conclusion. Defendants also note, not surprisingly, that their retained expert, Mr. Kenneth Baseman, disagrees with Shaffer's analysis. However, the defendants do not identify any widely-accepted tests for determining marginal costs, nor do they specifically substantiate that Shaffer's methodology as a whole is completely without rational basis. In short, although defendants disagree with Shaffer's methods and conclusions as to determining marginal costs, they have not convinced this Court that said conclusions are unreliable as a matter of law.

VII. *Shaffer's Lost Profits Opinion*

Finally, the defendants argue against the admissibility of Shaffer's opinion as to Berlyn's lost profits as a result of Press Network's actions. Shaffer concluded that Berlyn's lost profits, depending on certain assumptions, could be estimated at $700,000 to $852,000. These figures represent the amount Berlyn would have made but for the actions of Press Network, which, according to the plaintiffs, wrongfully directed advertisers away from Berlyn's publications and toward Gazette.

Shaffer is objectively qualified to offer an opinion as to lost profits, essentially for the same reasons he is qualified to discuss pricing below marginal cost. Shaffer has spent most of his career dealing with the financial aspects of the newspaper industry, has obtained a graduate MBA, and has taught on the business aspects of publishing throughout his career. These qualifications render him capable under Fed. R. Evid. 702 to offer opinion evidence on general financial matters of newspaper business, including projected profits.

The defendants focus their challenge on Shaffer's methodology in reaching his lost-profits opinion. As with the "predatory pricing" opinion, the defendants identify alleged flaws which, they argue, lead to inaccurate assessments of damages. This Court, however, finds no specific flaw in Shaffer's methodology that renders his

analysis of lost profits unreliable as a matter of law. Shaffer's opinion cannot be excluded simply because the defendants' expert has reached a different conclusion or applied different methods for assessing damages. Certainly, the defendants may argue and present evidence showing that theirs is a more accurate statement of damages, but, at this time, the Court is not persuaded to exercise its discretion and to exclude the testimony in its entirety.

*CONCLUSION*

For the reasons stated above, it is hereby ORDERED that the defendants' motion to exclude the expert testimony of James B. Shaffer BE, and it hereby IS, GRANTED IN PART and DENIED IN PART as stated above.