UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BERLYN INCORPORATED, a Maryland
corporation; KENNETH C. ROSSIGNOL;
MONTGOMERY SENTINEL PUBLISHING,
INCORPORATED,

*Plaintiffs-Appellants,*

v.

THE GAZETTE NEWSPAPERS,
INCORPORATED; THE WASHINGTON
POST COMPANY, a body corporate of
the state of Delaware;
WASHINGTON AND BALTIMORE
SUBURBAN PRESS NETWORK, a body
corporate of the state of Delaware,

*Defendants-Appellees.*

No. 02-2152

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, Senior District Judge.
(CA-01-606-S)

Argued: May 8, 2003

Decided: August 18, 2003

Before WILKINS, Chief Judge, and GREGORY and
SHEDD, Circuit Judges.

Affirmed by unpublished opinion. Judge Gregory wrote the opinion,
in which Chief Judge Wilkins and Judge Shedd joined.

## COUNSEL

**ARGUED:** George William Liebman, Baltimore, Maryland, for Appellants. Arthur Douglas Melamed, WILMER, CUTLER & PICKERING, Washington, D.C., for Appellees. **ON BRIEF:** Melvin J. Sykes, Baltimore, Maryland, for Appellants. Ali M. Stoeppelwerth, Kyle M. DeYoung, WILMER, CUTLER & PICKERING, Washington, D.C.; David P. Donovan, WILMER, CUTLER & PICKERING, Tysons Corner, Virginia; Charles O. Monk, II, Daniel R. Chemers, Gretchen L. Klebasko, Patrick E. Clark, SAUL EWING, L.L.P., Baltimore, Maryland, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

GREGORY, Circuit Judge:

I

Berlyn, Inc., et al., a group of community-oriented, weekly-newspaper publishers, filed suit in federal district court against the Washington Post Company, et al., alleging multi-tiered violations of federal and state antitrust laws, along with claims of unfair competition, breach of contract, and tortious interference with contract. The defendants filed a motion for summary judgment, pursuant Rule 56(c) of the Federal Rules of Civil Procedure. The district court granted the defendants' motion as to all claims, and dismissed the case. For the reasons stated below, we affirm.[1]

---

[1] On March 4, 2003, Appellees filed a Motion to Strike. Insofar as the motion seeks to strike Appellants' proposed addendum to their reply brief, the motion is granted. The motion is denied in all other respects. Additionally, this court denies Appellants' request for costs related to the preparation of its Motion to Strike and its Motion to Have Joint Appendix Corrected.

## II

### A

The plaintiffs are Berlyn, Inc., ("Berlyn") Montgomery Sentinel Publishing, Inc., ("Montgomery Sentinel") and Kenneth C. Rossignol ("Rossignol")(collectively, "Appellants"). Berlyn is owned by Lynn and Bernie Kapiloff, and publishes the *Prince George's County Sentinel*. Montgomery Sentinel publishes the *Montgomery County Sentinel*. Rossingol is a self-described "one-man band" who publishes and produces the *St. Mary's Today*, in St. Mary's County, Maryland. Each of Appellants' newspapers are small, weekly, paid, community newspapers. For example, from 1997 to 2000, the *St. Mary's Today*'s total annual profits ranged from a low of $1,157 to a high of $16,138.

The defendants are the Washington Post Company ("Post Company"), the Gazette Newspapers, Inc. ("Gazette"), and the Washington and Baltimore Suburban Press Network, Inc., ("Press Network")(collectively, "Appellees"). The Post Company publishes the *Washington Post*, which includes a weekly single section supplement dedicated to local news coverage (the "Extra"). Gazette publishes forty-four distinct weekly, community newspapers in the Washington, D.C. metropolitan area, and is a wholly-owned subsidiary of the Post Company. In addition, Gazette owns fifty percent of the Press Network, which is an organization designed to provide advertisers with one-stop shopping for placing ads in a series of local papers throughout the region. Appellants' complaint centers on two incidents, both of which are summarized below: the Press Network's activities in Prince George's County, and Gazette's acquisition of the Southern Maryland Division of the Chesapeake Publishing Corporation ("Chesapeake"), an organization that published community newspapers.

In 1992, Gay Nuttall, the founder of the Press Network, asked several area newspapers, including the *Prince George's Sentinel*, if they would become members of the Press Network. In particular, she told Lynn Kapiloff that the *Prince George's Sentinel* would "be her paper" in Prince George's County, meaning that the *Sentinel* would be the only newspaper in that county that would be a member of the Press Network. Nuttall and Kapiloff did not enter into any written contract,

and the details of their oral exclusivity agreement were vague. The agreement, for example, did not include any time limitation, although Lynn Kapiloff assumed that the agreement would run "forever." Additionally, the agreement did not specify what would be required of the *Sentinel* — e.g., whether it might be required to maintain a certain level of circulation or a certain level of publication quality.

In 1995, the *Prince George's Sentinel* had not improved as Nuttall had expected, and she began looking for other Prince George's County newspapers to include in the Press Network. She went to several publishers, including Chuck Lyons, the publisher of Gazette's newspapers. At the time, Gazette was enjoying considerable success in Montgomery County and other areas, but was not yet established in Prince George's County. In October of 1997, Gazette decided to enter Prince George's County, first with the *Greenbelt/College Park Gazette*, and with other publications soon thereafter. By 1998, the *Greenbelt/College Park Gazette* was profitable. Nuttall believed that Gazette's success proved that it would be a superior product for her advertisers. Since the advertisers were the clients who were paying for her service, her objective was to do the best that she could for them. Thus, by late 1997, the Press Network began presenting businesses with the choice of either advertising in the *Prince George's County Sentinel* or the *Prince George's County Gazette*. When asked to provide a recommendation, the Press Network's salespersons recommended Gazette newspapers.

Appellants, of course, offer a different account of the events. They insist that Gazette and the Press Network conspired to eliminate competition for Gazette in Prince George's County by: (1) orchestrating Gazette's entry into the county; (2) pressuring advertisers to choose Gazette over the *Prince George's County Sentinel*; and (3) conspiring to give Gazette preferred treatment on the rate cards the Press Network provided to advertisers.

The second major incident that forms the basis for this lawsuit is Gazette's acquisition of the Chesapeake's Southern Maryland Division. In October of 2000, Chuck Lyons learned that the Southern Maryland Division was for sale. Lyons thought the Southern Maryland Division's assets would compliment Gazette's existing operations. Thus, Gazette submitted a formal bid to buy Chesapeake for

$46 million, with funds loaned by the Post Company and booked to Gazette as an intercompany payable.

Appellants argue that this acquisition adversely affected (or had the potential to so affect) competition in Southern Maryland, including Montgomery, Prince George's, and St. Mary's Counties. They allege that the Post Company and Gazette now have a ninety-nine percent market share in the three counties, and that the Post Company and Gazette acquired Chesapeake's Southern Maryland Division as an intentional step toward seizing monopoly power.

### B

Based on all of these activities, Apppellants filed suit in federal district court alleging violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), Section 7 of the Clayton Act (15 U.S.C. § 18), and Section 11-204(a)(1) of the Maryland Antitrust Act. In addition to their federal and state antitrust claims, Appellants asserted causes of action based on unfair competition, breach of contract, and tortious interference with contract. Appellees filed a motion for summary judgment, arguing that Appellants were unable to establish the relevant product or geographic markets to support their antitrust claims. On the state common-law claims, Appellees insisted that they were entitled to summary judgment based on the insufficiency of Appellants' evidence. The district court agreed with Appellees on all grounds and dismissed the case. This appeal followed.

### III

Before addressing Appellees' motion for summary judgment, we must first consider Appellants' allegation that the district court erred in refusing Dr. Thomas Overstreet, Appellants' proposed microeconomist, additional time to develop his opinion and offer evidence in opposition to Appellees' motion for summary judgment. We review this decision of the district court for abuse of discretion. *United States v. Jones*, 136 F.3d 342, 349 (4th Cir. 1998).

Appellants' motion for leave to designate Overstreet as an expert witness provided, "If Defendants designate a microeconomist, Plain-

tiffs request leave to offer Dr. Overstreet as a rebuttal expert who would testify on deposition and after the depositions of Defendants' experts." (J.A. at 144.) That is, Appellants sought to offer Overstreet solely as a rebuttal witness, and not as a expert witness in their case in chief. The district court *granted* the motion, but clarified, "Although plaintiffs may designate a 'rebuttal' expert, that expert's testimony may not be used in plaintiffs' case in chief, nor may it be relied upon to support an opposition to any dispositive motion forthcoming from the defendants." (J.A. at 182.)

It is well-settled that, "[o]rdinarily, rebuttal evidence may be introduced *only* to counter new facts presented in the defendant's case in chief. . . . Permissible rebuttal evidence also includes evidence unavailable earlier through no fault of the plaintiff." *Allen v. Prince George's County*, 737 F.2d 1299, 1305 (4th Cir. 1984) (emphasis added). In light of this rule, the district court decided not to delay its consideration of Appellees' motion for summary judgment by providing Dr. Overstreet with additional time to develop evidence that may (or may not) have been useful to Appellants' case in chief. Because Appellants never contended that Dr. Overstreet's testimony was unavailable to them earlier through no fault of their own, the district court found that any delay would be unwarranted. The court's ruling on this matter was not an abuse of discretion. Accordingly, we affirm the district court's decision, and turn our attention to Appellees' motion for summary judgment.

IV

We review a district court's grant of summary judgment *de novo*. *See Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995). The Post Company, Gazette, and the Press Network insist that they are entitled to summary judgment on Appellants' antitrust allegations, which are as follows. First, Appellants allege that the Press Network's exclusionary bylaws, which gave Gazette effective veto power over which newspapers could become members of the Press Network, violated Section 1 of the Sherman Act. "To establish a violation of § 1 of the Sherman Act, Plaintiffs must first show: "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). In addition, they must also "prove the existence of

'antitrust injury,' which is to say injury of the type the anti-trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 203 (internal citations omitted).

Second, based on Section 2 of the Sherman Act, Appellants allege that Gazette and the Post Company have been engaged in an attempt to monopolize, and they and the Press Network have conspired to monopolize the community newspapers business throughout Southern Maryland, including Prince George's and Montgomery Counties. "Two elements comprise the offense of monopolization [under Section 2 of the Sherman Act]: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic acumen.'" *Oksanen v. Page Mem. Hosp.*, 945 F.2d 696, 710 (4th Cir. 1991) (citations omitted).

Third, Appellants allege that Gazette's acquisition of the Chesapeake's Southern Maryland Division violated Section 7 of the Clayton Act. Section 7 prohibits any individual or organization from acquiring "the whole or any part of the stock or other share capital" of another organization where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (2003). In order to have standing to challenge a merger under Section 7, a plaintiff must be able to show that he is likely to suffer or has suffered an antitrust injury as a result of the allegedly unlawful merger. *Cargill, Inc. v. Monfort of Colorado*, 479 U.S. 104, 122 (1986). "[T]hreatened loss from increased competition" is not sufficient to meet this burden. *Id.*

Lastly, Appellants allege violations of the Maryland Antitrust Act. "Section 11-204(a)(1) of the Maryland Act is essentially the same as § 1 of the Sherman Antitrust Act . . . ." *Natural Design, Inc. v. Rouse Co.*, 485 A.2d 663, 666 (Md. 1984). Interpreting state antitrust law, Maryland courts are to "'be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters.'" *Id.* (quoting Maryland Antitrust Act, § 11-202(a)). Thus, Appellants state antitrust claims simply mirror their Sherman Act claims.

Two essential elements of Appellants' federal and state antitrust claims are proof of the relevant product and geographic markets.[2] *See Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 683 (4th Cir. 1992) (Section 1 of the Sherman Act); *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 104 (4th Cir. 1987) (Section 2 of the Sherman Act); *Barber & Ross, Co. v. Lifetime Doors, Inc.*, 810 F.2d 1276, 1279 (4th Cir. 1987) (Section 7 of the Clayton Act); *Fed. Trade Comm'n v. Food Town Stores, Inc.*, 539 F.2d 1339, 1344 (4th Cir. 1976) (Section 7 of the Clayton Act); *Natural Design, Inc., v. Rouse Co.*, 485 A.2d 663 (Md. 1984) (Maryland Antitrust Act). That is, in order to determine whether any antitrust violation has occurred, "we must first define the relevant market because the concept of competition has no meaning outside its own arena, however broadly that arena is defined. The plaintiff in an antitrust case bears the burden of proof on the issue of the relevant product and geographic markets." *Satellite Television & Assoc. Res., Inc., v. Continental Cablevision of Virginia, Inc.*, 714 F.2d 351, 355 (4th Cir. 1983).

A relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced . . . ." *United States v. E. I. duPont de Nemours and Co.*, 351 U.S. 377, 404. *See also Satellite Television & Assoc. Res., Inc.*, 714 F.2d at 356 (holding that a plaintiff must show "that commodities [are] reasonably interchangeable by consumers for the same purpose" within that market). For all of their antitrust claims, Appellants contend that the product market consists of the legal and commercial advertising services provided by weekly community newspapers and the Post Company's Extra. Excluded from this proposed market are other forms of print advertising, such as direct mail and fliers, along with non-print media advertising on radio or local cable television. In support of this product market, Appellants contend, "These products [within the proposed market] are distinct from daily newspapers and other print media (e.g., direct mail) as well as nonprint media, which are much more costly and less focused on matters of local interest." (Br. for Appellants, at 43.) Appellants note that an individual newspa-

---

[2]Because we find that Appellants have failed to establish a relevant product market, as explained below, we need not consider whether their evidence is sufficient to establish the necessary geographic markets.

per reader would not consider radio, direct mail, or local cable television as "reasonably interchangeable" with a community newspaper.[3]

The flaw with this argument is that newspaper readers are not the relevant consumers for the purposes of the *duPont* test. *See* 351 U.S. at 404. The consumers in this case are the advertisers, and from the advertisers' perspectives, direct mail and other forms of advertising may well be "reasonably interchangeable." With the proper consumer in mind, we now consider the evidence that Appellants have marshaled in support of their proposed product market.

The strongest of that evidence is as follows. First, Appellants' cite to what appears to be an advertising flier produced by the Press Network.[4] The one-page flier states, in part:

> Press Network readers look to their suburban newspapers to tell them where to find what they need at stores right in their own neighborhoods, not across town or across the river. They don't seek this kind of information on TV or radio. They know that if they see a print ad, it's there to go back

[3]Appellants also seek to rely on the testimony of their proposed expert witness, Mr. James Shaffer. The district court correctly ruled, however, that Shaffer is unqualified to offer expert testimony as an economist on the establishment of relevant product or geographic markets. While Shaffer has an MBA and significant executive experience in the newspaper industry, he subscribes to no economics journals, and, as of the date of his first deposition, could not name any economics journals. Needless to say, he has not published any economics-related articles. He is also unfamiliar with basic terminology and concepts used by economists who work on antitrust cases. Furthermore, Shaffer admitted that he had never conducted a relevant market analysis, and that any reading he had done on the subject came from materials provided to him by Appellants' attorneys.

[4]We note that the document "appears to be" an advertising flier, because Appellants have failed to lay a foundation for the introduction of this document into evidence, and its origins are not clear. There are similar admissibility problems with much of Appellants' documentary evidence. Even assuming that this evidence would be admissible at trial, however, it still fails to aid Appellants in their effort to establish a relevant product market.

> to whenever they need it, without having to wait until the next time a commercial airs. Print ads don't just make an impression; they sell!

(J.A. at 1243.) Appellants claim that with this flier, the Press Network has effectively conceded that TV and radio are not in the same product market as print media. We, however, find that this flier tends to prove exactly the opposite. By sending this flier out to local businesses, the Press Network appears to be trying to convince businesses to spend their limited advertising resources on print ads, not on radio or TV ads. Clearly, based on the fact that the flier goes to great lengths to show how much better print media is than radio or TV, the Press Network sees these other media outlets as key competitors.

Second, Appellants rely on a Washington Post Business Marketing Strategy paper to show that the Post Company considers radio to be a "medium that delivers lower total audiences but a higher concentration of specific 'target groups,'" and that the "[a]dvertising costs have increased substantially with local radio." (J.A. at 1262.) Again, if anything, this evidence tends to show that all of these media outlets are within the same product market, to the extent that they are competing for the same limited pool of advertisers' dollars. The document observes, for example, "More and more media are targeting slices of the pie. Targeted media — cable television, radio, community newspapers, and the Internet — have been the fastest growing in the past five years." (J.A. at 1249.)

There is an additional, fundamental weakness with Appellants' definition of the relevant product market. While their market definition is underinclusive as explained above, it is also overinclusive, because it places legal advertising in the same market as commercial advertising. Kenneth Baseman, the Post Company's expert witness, explained:

> The economics of legal advertising differs substantially from the economics of other forms of advertising carried in newspapers. The primary reason for this difference is that circulation is very valuable to other forms of advertising, but has either no value or very limited value to legal advertisers. . . . Many legal advertisers are simply looking for the chea-

pest way to meet a legal notice requirement. For these advertisers, circulation has no value. They simply want the cheapest newspaper that meets the requirements to be a paper of record. This will often be a low circulation paper.

(J.A. at 2582.) Appellants have offered no evidence to rebut Baseman's testimony on this point.

In sum, it is clear that Appellants have failed to meet their burden to establish the relevant product market. Accordingly, the Post Company, Gazette, and the Press Network are entitled to summary judgment on this ground alone, at least as to Appellants' claims relating to the Maryland Antitrust Act, Section 2 of the Sherman Act, and Section 7 of the Clayton Act.

The failure to define a relevant product market is not necessarily dispositive, however, of Appellants' claim under Section 1 of the Sherman Act, as they have alleged a *per se* violation of the Sherman Act based on the bylaws of the Press Network. In making this argument, Appellants suggest that the Press Network is an essential facility to operating a community newspaper in the Washington, D.C. area, and that the Press Network's exclusion of the plaintiffs would be a *per se* violation of the Sherman Act.[5]

There are three methods of analysis in the antitrust context: "(1) per se analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some procompetitive justification, and (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine." *Dickson*, 309 F.3d at 205 (quoting *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002)). Appellants point to only one allegedly anticompetitive effect of the Press Network's bylaws: that the bylaws allow Gazette, as a fifty percent shareholder of the Press Network, to exer-

---

[5]The elements of an essential facilities claim are: (1) control of the facility by a monopolist; (2) a competitor's inability reasonably to duplicate the facility; (3) denial of the use of the facility to a competitor; (4) feasibility of providing the facility to the competitor. *Laurel Sand & Gravel, Inc. v. CSX Transportation, Inc.*, 924 F.2d 539, 544 (4th Cir. 1991).

cise veto power over who can become a member of the network, thereby allowing Gazette to exclude any competing newspaper that it wishes. Appellants have no evidence, however, to suggest that the Press Network and Gazette have conspired to provide Gazette with this power for any anticompetitive reason. In fact, it seems clear that if Gazette did exercise its power in an anticompetitive manner, the result would be a significant loss of business for the Press Network.

Businesses advertise through the Press Network only because it provides them with one-stop shopping, allowing them to advertise in *several*, different community newspapers without having to make separate arrangements with each of those papers. If Gazette were to bar all non-Gazette publications from joining the Press Network, the network itself would become useless. It would be just as easy for advertisers to go directly to Gazette, without having to donate a portion of their advertising budgets to a middleman like the Press Network. In short, the Press Network can only provide a useful service to its consumers if there is a great deal of competition in the newspaper marketplace, with a diverse array of community newspapers in which businesses may wish to advertise.

As a result, the procompetitive justifications for the Press Network are readily apparent. The Press Network allows smaller community newspapers who are members of the Press Network to more effectively compete with other media outlets for advertisers' dollars in the intensely competitive Washington, D.C. metropolitan area. The more quality newspapers that the Press Network includes in its membership, the more attractive its service becomes to businesses. Far from having an anticompetitive effect, it appears that the Press Network permits community newspapers to thrive in a marketplace that might otherwise be reluctant to tolerate small publications that do not have a presence throughout the entire Washington, D.C. region.

Accordingly, Appellants' attempt to allege a *per se* violation of the Sherman Act fails, and the rule of reason analysis continues to apply to *all* of Appellants' antitrust claims, including their Section 1 claim under the Sherman Act. Because they have failed to establish a relevant product market, as explained above, Appellants' claims under Section 1 of the Sherman Act fail at the summary judgment stage,

along with their claims under Section 2 of the Sherman Act, Section 7 of the Clayton Act, and the Maryland Antitrust Act.

V

In addition to the antitrust claims discussed above, Appellants have alleged breach of contract and tortious interference with contract under Maryland law. Appellants base these allegations on their theory that Kapiloff and Nuttall entered into a binding contract whereby the *Prince George's Sentinel* would be the Press Network's exclusive newspaper in Prince George's County. Kapiloff concedes that no written document exists memorializing this agreement, and she further concedes that Nuttall never stated that the *Sentinel* would be "her paper" in perpetuity. In fact, it is logical to assume that Kapiloff's and Nuttall's exclusivity agreement would continue only so long as it was beneficial to both parties, which would require that the *Prince George's Sentinel* meet Nuttall's reasonable expectations for the quality of the publication and the level of circulation in the county. The *Sentinel*'s failure to meet these expectations justifies Nuttall's decision to sever the exclusivity agreement, assuming that one existed. Accordingly, Appellants' claims of breach of contract and tortious interference with contract must be dismissed.

Appellants have also stated a claim of unfair competition. To prove unfair competition under Maryland law, a plaintiff must show that a defendant damaged or jeopardized his or her business "by fraud, deceit, trickery, or unfair methods...." *Baltimore Bedding Co. v, Moses*, 34 A.2d 338 (Md. 1943). As the district court concluded, there simply was no evidence of any fraud or collusion between the Press Network, Gazette, and the Post Company. Accordingly, this claim must also be dismissed.

VI

For the foregoing reasons, the district court's rulings are in all respects

*AFFIRMED.*