**UNITED FOOD MART, INC. d/b/a Lakes Shell and United Food Mart # 2, Inc. d/b/a Turnpike Shell, Plaintiffs,**

**v.**

**MOTIVA ENTERPRISES, LLC, Defendant.**

No. 04–60539–CV.

United States District Court, S.D. Florida, Miami Division.

Sept. 29, 2005.

William S. Isenberg, Isenberg & Associates, Fort Lauderdale, FL, Jason Scott Coupal, Jason S. Coupal, Los Angeles, CA, for United Food Mart, Inc., a Florida corporation dba Lakes Shell dba Turnpike Shell, United Food Market #2, Inc., Plaintiffs.

Stephen Richard Astley, Lerach Coughlin Stoia Geller, Rudman & Robbins, Boca Raton, FL, Samuel Alberto Danon, Laurie Uustal Mathews, Christina T. Ng, Carlo A. Rodriguez, Hunton & Williams, Miami, FL, for Motiva Enterprise, LLC, a Texas limited liability company, Defendant.

## ORDER STRIKING OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERT WITNESS

ALTONAGA, District Judge.

**THIS CAUSE** came before the Court on Defendant, Motiva Enterprises, LLC's ("Motiva['s]") Motion in Limine to Strike or Exclude the Opinions and Testimony of Howard Marmorstein, filed on July 26, 2005 **[D.E. 77]**. The Court has considered the parties' written submissions and held a *Daubert*[1] hearing on September 26, 2005.

On July 12, 2004, Plaintiffs, United Food Mart, Inc. d/b/a Lakes Shell ("Lakes Shell") and United Food Mart #2, Inc. d/b/a Turnpike Shell ("Turnpike Shell"), filed an Amended Complaint, alleging breach of contract and violation of the Florida Motor Fuel Marketing Practices Act ("FMFMPA").[2] Plaintiffs, who operate gasoline service stations under the "Shell" brand name, allege that Motiva, their fuel supplier, charged discriminatory prices for motor fuel under the parties' Retail Sales Agreements. On May 31, 2005, Motiva moved for summary judgment, arguing, among other things, that Plaintiffs have failed to come forward with

---

1. *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

2. The FMFMPA makes it unlawful for any person engaged in commerce in Florida "[t]o sell for resale any grade of motor fuel at a price lower than the price at which the seller contemporaneously sells motor fuel of like grade and quality to another person on the same level of distribution, in the same class of trade, and within the same relevant geographic market as the purchaser ... where the effect is to injure competition." Fla. Stat. § 526.305(1)(a).

evidence showing that other nearby Shell stations, which Motiva charged different prices for fuel, were in the same "relevant geographic market" as Plaintiffs' stations.

On July 8, 2005, Plaintiffs submitted the Declaration of Howard Marmorstein, Ph.D. [D.E. 72] in opposition to Motiva's Motion for Summary Judgment. In his Declaration, Dr. Marmorstein opines that the service station operated by Lakes Shell (the "Lakes Station") is within the same relevant geographic market as two nearby Shell-branded service stations (the "Lexymart Shell" and "Broward Shell") for purposes of the FMFMPA.[3] Motiva now moves to exclude Dr. Marmorstein's testimony under Federal Rule of Evidence 702,[4] arguing: 1) that he is unqualified to render such an opinion, and 2) that he relied on an unsound methodology in reaching his conclusions.

"Federal Rule of Evidence 702, as explained by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and its progeny, controls determinations regarding the admissibility of expert testimony." *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir.1998) (footnote and citation omitted).

Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (footnote omitted). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999).

## 1. Qualification

Dr. Marmorstein has a bachelor's degree and M.B.A. from Wharton and a Ph.D. in business administration from the University of Florida, with a concentration in consumer behavior. He is a tenured associate professor of marketing at the University of Miami, where he has taught courses in consumer behavior, marketing research, and marketing management for the past 16 years. During this time, Dr. Marmorstein has published over 30 articles in academic journals, conducted studies and consulted for both for-profit and not-for-profit organizations, and served as an expert witness in a variety of cases that involved consumer behavior and marketing practices. Much of his work has focused on how consumers acquire and utilize price information in their shopping and purchase decisions. Dr. Marmorstein has won two national awards for research on consumer behavior.

---

**3.** Dr. Marmorstein also opines that Motiva exhibited bad faith toward Lakes Shell, and he makes an estimate of Lakes Shell's lost profits due to Motiva's alleged illegal conduct. (Marmorstein Decl. at 7–8.) The parties agree that the only opinion relevant to this case is whether the Lakes Station is within the same relevant geographic market as the Lexymart and Broward Shell stations.

**4.** "If scientific, technical, or other specialized knowledge will assist the trier of fact to un-

derstand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702.

Notwithstanding Dr. Marmorstein's impressive credentials, Motiva argues that he lacks the knowledge, skill, experience, training, or education to testify competently with regard to price discrimination claims brought by gasoline service stations. For example, Dr. Marmorstein admits that he has done no work or research in the petroleum industry and has conducted no research nor written any articles related to retail marketing of gasoline. Furthermore, although he is an expert in consumer behavior, which is one aspect of economics, he admits that he is not an expert in all fields of economics. He further admits that he has done no studies, written no articles, and published no research concerning the definition and measurement of competition. Motiva therefore asserts that Dr. Marmorstein lacks the necessary background to accurately determine whether the Lakes Station was in the same competitive market as either the Lexymart or Broward Shell.

■ "[G]eneral business experience unrelated to antitrust economics does not render a witness qualified to offer an opinion on complicated antitrust issues such as defining relevant markets." *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F.Supp.2d 530, 536 (D.Md.2002), *aff'd*, 73 Fed.Appx. 576 (4th Cir.2003) (unpublished opinion); *see also Victus, Ltd. v. Collezione Europa U.S.A., Inc.*, 26 F.Supp.2d 772, 786 (M.D.N.C.1998) (describing the issue of whether a relevant market exists as "a difficult economic question"); *Cogan v. Harford Mem'l Hosp.*, 843 F.Supp. 1013, 1020 (D.Md.1994) ("To allow a jury to make a finding as to the geographic market, [a plaintiff] must provide the Court with expert testimony on this highly technical economic question.").

In *Berlyn*, for example, the court found a witness with general business knowledge in the publishing industry to be unqualified to offer an opinion concerning the "relevant market" for purposes of an antitrust claim:

> [The witness's] background is completely devoid of specific education, training, or experience in economics or antitrust analysis.... He has never performed a relevant market analysis for antitrust purposes, and at the time he was retained as an expert in this case, he was entirely unaware of how an economist would perform such a study.

> . . . . .

> [The witness's] extensive background in the publishing industry certainly qualifies him to offer expert opinions as to the "business side of the newspaper industry." However, it does not give him license to offer opinions as to antitrust economics and relevant market analysis simply because these topics relate to newspapers in this particular case. The experience one has in a given trade, however extensive and however closely related to the "business side" of that industry, does not render one presumptively qualified to define that industry's relevant markets.

214 F.Supp.2d at 537–38.

In this case, it is unnecessary to decide whether Dr. Marmorstein's impressive academic credentials and extensive research in the area of consumer behavior qualify him to perform the complicated economic analysis required to determine whether the Lakes Station is in the same relevant geographic market as the Lexymart or Broward Shell. This is because the testimony presented at the *Daubert* hearing, coupled with Dr. Marmorstein's written report and deposition testimony, make clear that Dr. Marmorstein employed an unreliable methodology in reaching his conclusions regarding competition between the Lakes Station and the Lexymart and Broward Shell stations.

## 2. Reliability

 "District courts 'have substantial discretion in deciding how to test an expert's reliability ....'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (quoting *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir.1999)). "*Daubert* instructs courts to consider the following factors: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir.2002) (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786). This "test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

At the *Daubert* hearing, John R. Umbeck, Ph.D., an economics professor at Purdue University with extensive experience in the petroleum industry, testified regarding generally accepted methods in the economics community for determining whether products or businesses compete with one another—and are therefore considered to be in the same market. According to Dr. Umbeck, the primary method for measuring competition between products or services is to perform a "cross-price elasticity" analysis.[5] To perform such an analysis for two gasoline service stations, Dr. Umbeck testified that a great deal of data would be needed, such as information on natural boundaries, traffic flow, traffic patterns, population distribution, market conditions, existing developments, etc. Dr. Umbeck stated that a consulting firm, MPSI, performed such a study for Motiva in order for Motiva to establish its zone area pricing system.

According to Dr. Umbeck, because a proper cross-price elasticity analysis may be quite involved, the next best method which is generally accepted in the economics community (and was originally suggested by a Nobel laureate in economics, George J. Stigler) is to determine whether a positive correlation exists between the retail prices of two products or services in question. One commentator has described this method as follows:

> One method often used to determine whether it is likely that two products are in the same market is to examine the behavior of the product prices over a period of time. When two products are in the same market (because of either demand or supply substitution), their prices will tend to move together. Thus one useful and powerful way to test whether two products are in the same market is to correlate their prices. This test is best thought of as necessary, but not sufficient. If prices are not highly correlated, it is unlikely that they are part of a single market; but if they are highly correlated, they may well be part of the same market.

Andrew M. Rosenfield, *The Use of Economic Analysis in Antitrust Litigation and Counseling*, 1986 Colum. Bus. L.Rev. 49, 63 (1986) (citing Stigler & Sherwin,

---

5. "High cross-elasticity between two products suggests that they are in the same market." *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 713 (7th Cir.1979) (footnote omitted). Specifically, "[p]roducts that are similar to each other, that are substitutes for each other, that are positive cross-elasticity. That is, if the price of *A* remains constant, an increase in the price of *B* will generate more sales of *A* as buyers switch to it. High cross-elasticity means that if the price of *A* remains constant, an *X* % increase in the price of *B* will generate a greater than *X* % increase in the sales of *A*." *Id.* at 713 n. 12.

*Extent of the Market,* 28 J.L. & Econ. 565 (1985)).

In this case, Dr. Marmorstein performed neither of the analyses described by Dr. Umbeck, which are generally accepted in the economics community, before arriving at his conclusion that "both Broward Shell and Lexymart Shell were direct competitors of [Lakes Shell]." [6] (Marmorstein Decl. at 4.) Instead, Dr. Marmorstein merely visually observed the physical proximity of the Lakes Station to the two alleged competitors and performed an analysis of the Lakes Station's sales volume compared to the sales volume at the Lexymart Shell.

With respect to the first "analysis," Dr. Marmorstein states the following in his Declaration:

> To determine whether these stores were competitors, I began by driving to the respective stations. The distance from Broward Shell to [Lakes Shell] is just under 1 mile on the same roadway. The distance from [Lakes Shell] to Lexymart Shell is almost exactly 2 miles, again on the same roadway. Previous research, as noted by Dr. Umbeck, has found that gas stations' principal competition is comprised of stations that are one to two miles away. In addition, one would expect that the distance between competing stations might expand somewhat when the stations lie on the same thoroughfare and could contract when they are not on the same path. Even using Dr. Umbeck's definition of competition, both Broward Shell and Lexymart compete with [Lakes Shell]. . . .

> . . . . .

In the real world, the purchase of gasoline is an activity that can be undertaken on any of a number of occasions that suit the consumer's mood, attire, travel plans, etc. . . . . By virtue of consumers' normal adaptive shopping behavior, they learn which stations along their travel path offer lower prices. Those stations that are within 2 miles distance on the same thoroughfare, of the same brand, are clearly in direct competition for customers.[7]

(*Id.* at 4–5.)

Dr. Umbeck agrees that it is reasonable to assume that two gasoline service stations within one to two miles of each other along the same roadway would compete with one another. However, Dr. Umbeck correctly points out that Dr. Marmorstein has done nothing, except to drive between the stations in this case, to test this hypothesis. For example, Dr. Marmorstein has not considered how many traffic lights are between each station, how many other gasoline stations are located between each station, how many cars pass by each station, or whether each station's price sign is two-sided.

Furthermore, Dr. Marmorstein has failed to test his assertion that, by virtue of their normal adaptive shopping behavior, consumers learn which stations along their travel path offer lower prices. There is no discussion, for example, of what is the typical "travel path" or "shopping behavior" for commuters or residents of the area surrounding the stations in this case. In this regard, there is no discussion of population distribution in the area, location of major commercial or residential areas,

---

6. Dr. Marmorstein's opinion addresses only Lakes Shell and does not address Turnpike Shell. (Marmorstein Decl. at 2.)

7. Dr. Marmorstein adds that because oil companies have attempted to build brand loyalty through, among other things, credit cards and payment processes, "[f]or the segment of consumers who have become loyal to a specific brand, the intra-brand competition in the product category is likely to be strong." (Marmorstein Decl. at 7.)

traffic patterns and flow from major thoroughfares, and barriers to entry or exit at each station.

In this case, Dr. Marmorstein has made an assumption that because the Lakes Station is geographically located within one to two miles of Lexymart Shell and Broward Shell, it must necessarily compete with them. He has failed, however, to test this theory with an analysis of the geography surrounding the stations or an assessment of the actual behavior of potential customers. He has also pointed to no published or peer-reviewed authority supporting this theory (except to say that it is supported by "[p]revious research, as noted by Dr. Umbeck"). Furthermore, Dr. Marmorstein has failed to assess any known or potential rate of error. Accordingly, although his hypothesis may be reasonable, Dr. Marmorstein has failed to apply it in a reliable manner in this case.

Not only has Dr. Marmorstein looked at the location of the Lakes Station relative to the Lexymart and Broward Shell stations, but he has also compared the sales volume at the Lakes Station to the sales volume at the Lexymart Shell, in an effort to support his conclusion that the two stations compete. According to Dr. Marmorstein, if two gasoline service stations are in the same competitive market, one would expect their sales volume to be negatively correlated, meaning that when one station experiences an increase in sales, its competitor would generally experience a decrease in sales. Dr. Marmorstein explained the results of his analysis in this case as follows:

> Only in the event that [Lakes Shell] and Lexymart Shell were competing directly for the same customers would one observe a negative relationship between the sales at these stations over time. . . .
>
> In fact, there is a statistically significant negative correlation ($r = .37$; $p < .05$) between the sales at [Lakes Shell] and Lexymart Shell Stations. Sales losses experienced by [Lakes Shell] accrued directly to the benefit of Lexymart Shell, which was able to offer its gasoline at a lower price because of the "preferred" treatment that it received from Motiva. . . . [W]e can be 95% confident that declines in [Lakes Shell's] sales volume are related to the gain in sales achieved by Lexymart due to its unfair price advantage. This provides clear and compelling evidence of the direct, substantial competition between [Lakes Shell] and Lexymart.
>
> . . . As [Lakes Shell] suffered from price discrimination, sales at Lexymart Shell increased dramatically. Over time, more consumers learned that Lexymart was consistently cheaper—thus, their shift in patronage became much more pronounced in late 2003. Because Lexymart Shell received even more favorable DTW prices than Broward Shell, the shift in some consumer purchases from [Lakes Shell] to Broward Shell is obscured. As our conceptual analysis (see above) suggested and our empirical analysis showed, [Lakes Shell] and the other two Motiva stations are certainly in direct competition, irrespective of Motiva's assertions and Dr. Umbeck's strained attempt to justify Motiva's price discrimination.

(Marmorstein Decl. 6.)

There are several apparent flaws in Dr. Marmorstein's approach. First, Dr. Marmorstein has only compared the sales volume at the Lakes Station with the sales volume at the Lexymart Shell, yet he concludes that this empirical analysis shows that the Lakes Station is in direct competition with Broward Shell. Dr. Umbeck has testified that there is a strongly *positive* correlation between the sales volume at the Lakes Station and the Broward Shell between January 2002 and May 2004,

which would mean, according to Dr. Marmorstein's theory, that the two stations are *not* in competition.

Second, Dr. Marmorstein fails to properly account for a dramatic increase in sales at the Lexymart Shell during the fourth quarter of 2003. Dr. Marmorstein's regression analysis shows a negative correlation in sales volume between the Lakes Station and Lexymart Shell from January 2002 to May 2004. According to Dr. Marmorstein, this shows that the Lakes Station competed with the Lexymart Shell for that entire period.

However, Dr. Umbeck testified that when the time period after September 2003 is removed from the analysis, there is a *positive* correlation between Lexymart's sales and Lakes' sales, which, according to Dr. Marmorstein's theory, means that the Lakes Station and Lexymart Shell did *not* compete from January 2002 through September 2003. During the fourth quarter of 2003, the volume of gasoline sold at the Lexymart Shell dramatically increased. For example, in August 2003, Lexymart Shell sold slightly more than 100,000 gallons of fuel, but in March 2004, it sold more than 500,000 gallons.

Dr. Marmorstein attributes this increase in sales at Lexymart to the fact that "[o]ver time, more consumers learned that Lexymart was consistently cheaper—thus, their shift in patronage became much more pronounced in late 2003." However, Dr. Marmorstein's theory shows that the Lakes Station and Lexymart Shell were *not* in competition prior to September 2003. Furthermore, the volume of gasoline sold at the Lakes Station remained relatively constant in late 2003; it did not dramatically decrease in response to the increase in sales at Lexymart. Dr. Marmorstein's analysis fails to properly account for the dramatic increase in sales at Lexymart during late 2003, and by including this data in his regression analysis, he

draws the incorrect conclusion that the Lakes Station and Lexymart Shell were in competition for the entire period from January 2002 through May 2004.

A third obvious example of the unreliability of Dr. Marmorstein's analysis is its failure to take into consideration the retail price of gasoline charged by Lakes Shell or Lexymart Shell. Dr. Marmorstein states that "[s]ales losses experienced by [Lakes Shell] accrued directly to the benefit of Lexymart Shell, which was able to offer its gasoline at a lower price because of the 'preferred' treatment that it received from Motiva." Dr. Marmorstein, however, fails to cite any data showing whether Lexymart did, in fact, offer its gasoline at a lower price than Lakes Shell. Dr. Umbeck testified, and the relevant literature corroborates, that analysis of two products' relative retail prices is a useful way to test whether they are in the same market. In this case, Dr. Marmorstein did no such analysis of retail prices.

Finally, Dr. Marmorstein concludes that "we can be 95% confident that declines in [Lakes Shell's] sales volume are related to the gain in sales achieved by Lexymart due to its unfair price advantage." While it is true that a regression analysis, such as the one that Dr. Marmorstein performed, shows a *relationship* between two sets of data, it does not, as Dr. Marmorstein suggests, imply a *causal relationship.* Even Dr. Marmorstein acknowledges that just because sales at two gasoline service stations may have a negative correlation, it does not necessarily mean that they are competitors or that one has received an "unfair price advantage."

Dr. Marmorstein has observed that Lexymart Shell and Broward Shell are within one to two miles of the Lakes Station. He has also observed a negative correlation in sales volume between the Lakes Station and Lexymart Shell for the period from

January 2002 to May 2004. Without any further analysis of relevant data or of the facts of this case, he concludes that the Lakes Station was in direct competition with both the Lexymart and Broward Shell stations. He further concludes that an unfair price advantage caused Lexymart Shell's sales to increase to the detriment of Lakes Shell. Unfortunately, "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

As discussed, Dr. Marmorstein has failed to test his hypotheses, by reference to specific facts of this case, regarding possible competition between the Lakes Station and the Lexymart or Broward Shell. He has also employed a simplistic methodology and has drawn inappropriate conclusions to answer a highly technical economic question. Dr. Marmorstein's approach has not been subjected to peer review, has an unknown rate of error, and is not generally accepted in the economics community. Accordingly, it is

**ORDERED AND ADJUDGED** that Motiva's Motion in Limine to Strike or Exclude the Opinions and Testimony of Howard Marmorstein **[D.E. 77]** is **GRANTED.** Dr. Marmorstein's deposition, in-court testimony, and Declaration [D.E. 72] shall be excluded from evidence.